**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**VIRGINIA SUE STRICKER,**

                Plaintiff,

**v.**

                **CIVIL ACTION NO.: 2:15-CV-00015**
                **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

                Defendant.

# REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On February 18, 2015, Plaintiff Virginia Sue Stricker ("Plaintiff"), through counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On May 4, 2015, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 4; Admin. R., ECF No. 5). Plaintiff filed her Motion for Summary Judgment and Brief in Support of Judgment on the Pleadings on June 2, 2015. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 8; Pl.'s Br. in Supp. of J. on the Pleadings ("Pl.'s Br."), ECF No. 9). In turn, the Commissioner filed her Motion for Summary Judgment and Brief in Support of her Motion for Summary Judgment on July 1, 2015. (Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 10; Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br."), ECF No. 11). The matter has now been referred to the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge. 28 U.S.C. § 636(b)(1)(B) (2009); Fed. R. Civ. P. 72(b). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. <u>PROCEDURAL HISTORY</u>

On November 10, 2011, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB"), alleging disability that began on June 29, 2008. (R. 228). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2013; therefore, Plaintiff must establish disability on or before this date. (R. 111). Plaintiff's claim was initially denied on December 29, 2011, and denied again upon reconsideration on April 25, 2012. (R. 162, 174). On May 11, 2012, Plaintiff filed a written request for a hearing, which was scheduled for October 30, 2013. (R. 121, 181).

A video hearing was held before United States Administrative Law Judge ("ALJ") Jack Penca in Charleston, West Virginia. (R. 111, 121, 123). Nancy Shapero, an impartial vocational expert, appeared and testified in Charleston. (R. 121, 216, 219). Plaintiff, represented by counsel Shannan Hinzman, Esq., of Jan Dils Attorneys at Law LC, appeared and testified in Parkersburg, West Virginia. (R. 111). During the hearing, Plaintiff amended her onset date from June 29, 2008, to April 1, 2012.[1] (R. 124-25). On

_____

[1] Plaintiff amended her onset date to April 1, 2012, because she believed that "she should be reduced to a sedentary [Residual Functional Capacity] level" at this date, mandating a

2

November 20, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 108).

On January 14, 2014, Plaintiff requested that the Appeals Council review the ALJ's decision and submitted additional evidence for the Appeals Council to consider. (R. 7-107). The Appeals Council reviewed the additional evidence but determined that it was not relevant. (R. 2). The Appeals Council reasoned that the evidence was dated after November 20, 2013, the date of the ALJ's decision, and that, therefore, it "does not affect the decision about whether [Plaintiff was] disabled beginning on or before November 20, 2013." (Id.). On December 22, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

### III.  BACKGROUND

#### A.  Personal History

Plaintiff was born on June 29, 1958, and was fifty-three years old at the time she filed her claim for DIB. (See R. 228). She is married and resides with her husband. (R. 253). She has completed school through the twelfth grade and has received specialized job training, including attending secretarial classes and "volunteer[ing] as an [EMT] aid, driver and dispatcher." (R. 245). Plaintiff's prior work experience includes working as an office assistant, cashier, secretary and sewing machine operator. (R. 261). Plaintiff alleges that she is unable to work due to the follow impairments: (1) scoliosis of the spine; (2) bone spurs in the neck and spine; (3) arthritis in the back and knees (4) osteoarthritis; (5) rheumatoid arthritis; (6) bilateral leg pain; (7) diabetes mellitus and (8) asthma. (R. 244; Pl.'s Br. at 16).

finding of disability under the Medical-Vocational Guidelines. (R. 124-25).

**B.      Medical History**

**1.  Medical History Pre-Dating Alleged Onset Date of April 1, 2012**

Plaintiff receives primary care from Thomas A. Herrmann, M.D., of Mid-Ohio Valley Medical Group, Inc. (See R. 401-458). In 2002, Dr. Herrmann referred Plaintiff to Gurpreet Brar, M.D., a rheumatologist. (R. 602). On February 14, 2002, Plaintiff presented to Dr. Brar, complaining that she had been experiencing muscle and joint pain since 1996. (Id.). Dr. Brar examined Plaintiff and diagnosed "suspect[ed] early symmetrical inflammatory polyarthropathy." (Id.).

Over the next several months, Plaintiff presented to Dr. Brar for numerous follow-up appointments. (R. 603, 611). On July 21, 2003, Dr. Brar diagnosed Plaintiff with mild seronegative rheumatoid arthritis. (R. 603). Dr. Brar prescribed sulindac, a non-steroidal anti-inflammatory drug, to be taken as needed for joint pain. (Id.). He instructed Plaintiff to return for annual visits to monitor her condition. (Id.).

Per Dr. Brar's instructions, Plaintiff continued to present to Dr. Brar for annual examinations. On July 19, 2004, Dr. Brar noted that Plaintiff "ha[d] done well since the last visit" and that her "arthritic complaints are well controlled on current treatment." (Id.). Dr. Brar further noted that, since her last appointment, Plaintiff had undergone an arthroscopy on her left knee due to a cartilage tear. (Id.). Subsequently, on October 16, 2006, Dr. Brar documented that Plaintiff had undergone a second arthroscopy of her left knee because "the first one did not help." (R. 601). Dr. Brar also changed Plaintiff's prescription of sulindac to Celebrex and updated Plaintiff's diagnosis of mild rheumatoid arthritis to "[w]ell controlled." (Id.).

In February and March of 2008, Plaintiff presented to Dr. Herrmann with complaints of back and bilateral leg pain. (R. 455, 457). Dr. Herrmann ordered an ultrasound of Plaintiff's legs and an X-ray of her lumbar spine. (R. 454, 483). The ultrasound showed no abnormalities. (R. 453). The X-ray, however, revealed "[m]ild degenerative changes[,] . . . mild scoliosis of the lumbar spine [and] . . . [v]ascular calcifications." (R. 483).

On March 20, 2008, Plaintiff presented to Dr. Brar for her annual examination, complaining of diffuse leg pain and escalating back pain. (R. 600). An examination revealed that Plaintiff experienced pain-free range of motion of all of her peripheral joints and that none of her joints were swollen or tender. (Id.). However, Dr. Brar noted "generalized loss of muscle tone and poor muscle strength affecting the lower extremities." (Id.). Dr. Brar diagnosed deconditioning and ordered that Plaintiff begin physical therapy. (Id.). Dr. Brar also noted that Plaintiff no longer takes Celebrex but instead uses "[o]ver-the-counter ibuprofen/Naproxen" for her arthritis. (See R. 600-01).

Several weeks later, on April 9, 2008, Plaintiff presented to Dr. Herrmann for a follow-up appointment regarding her leg and back pain. (R. 453). Dr. Herrmann reviewed Dr. Brar's most recent treatment notes and questioned why Plaintiff's muscles were deteriorating. (Id.). He noted that "[h]er MRI just showed a little arthritis, but nothing further." (Id.).

On May 7, 2008, after beginning an eight-week physical therapy regimen with Mountain River Physical Therapy, Plaintiff returned to Dr. Brar for a follow-up appointment regarding her leg and back pain. (R. 302-03, 600). During this appointment, Dr. Brar documented that Plaintiff "has [experienced] . . . significant

improvement of her back complaints and lower extremity complaints." (Id.). He further documented that Plaintiff's rheumatoid arthritis was inactive. (Id.).

On August 4, 2008, Plaintiff presented to Dr. Herrmann for a follow-up appointment regarding her deconditioning. (R. 449). After an examination, Dr. Herrmann reported that Plaintiff was "doing a lot better. She left her job where she was on concrete all day and her muscle aches are largely gone now." (Id.). Dr. Herrmann also updated Plaintiff's diagnoses of leg aches and muscle loss to "resolved, status post leaving her job." (Id.).

On May 4, 2009, Plaintiff returned to Dr. Brar for her annual examination, complaining of low back pain. (R. 599). After an examination, Dr. Brar diagnosed Plaintiff with osteoarthritis and chronic low back pain. (Id.). Dr. Brar also changed Plaintiff's pain medication from naproxen back to Celebrex. (Id.).

On August 27, 2009, Plaintiff presented to Vernon Lin, M.D., of the Cleveland Clinic Rehabilitation Institute for a consultation regarding her back pain. (R. 469-74). After an examination, Dr. Lin diagnosed Plaintiff with osteoarthritis of the lumbar spine. (R. 471). Dr. Lin recommended that Plaintiff continue her current level of pain management, maintain her current level of activities and participate in two physical therapy sessions. (R. 470-71). Subsequently, when Plaintiff returned to the Cleveland Clinic Rehabilitation Institute on October 1, 2009, Dr. Vernon reaffirmed her recommendations and noted that they constituted "conservative management" of Plaintiff's back pain. (R. 464-65).

On March 17, 2010, Plaintiff presented to Dr. Herrmann with complaints of pain and "some grinding" in her right knee. (R. 437). Dr. Herrmann noted that Plaintiff walked

with a slight gait disturbance that was "likely related to cartilage degeneration and arthritis." (Id.). An X-ray of Plaintiff's right knee was performed, which revealed no abnormalities. (R. 481). Dr. Herrmann prescribed Naprosyn for Plaintiff's pain. (R. 437).

On May 3, 2010, Plaintiff presented to Dr. Brar for her annual appointment. (R. 598). During this appointment, Dr. Brar noted that Plaintiff "ha[d] been working planting potatoes in her garden" and had developed mild tendinitis. (Id.). However, Dr. Brar documented that Plaintiff's osteoarthritis was "well controlled." (Id.).

On June 22, 2010, Plaintiff presented to Dr. Herrmann, complaining of neck pain that radiated down her left arm. (R. 434). After an examination, Dr. Herrmann diagnosed Plaintiff with "cervical strain with radiculopathy." (Id.). He instructed Plaintiff to apply ice and heat and to use over-the-counter anti-inflammatory medications for pain. (Id.). He also prescribed Skelaxin, a muscle relaxant. (Id.).

On October 20, 2010, Plaintiff returned to Dr. Herrmann, complaining of neck pain with radiating numbness, tingling, pain and weakness down her left arm. (R. 431). Dr. Herrmann ordered an MRI of Plaintiff's cervical spine, which "showed arthritis and [mild] degenerative disc disease ["DDD"]." (Id.). Some "spurring" was also shown. (R. 433). Subsequently, Plaintiff was diagnosed with "[c]ervical strain with recurrent cervical pain and some occasional radiculopathy down the left arm." (R. 429, 431).

On May 2, 2011, Plaintiff presented to Dr. Brar for her annual examination. (R. 598). During this visit, Dr. Brar noted that Plaintiff "ha[d] done well from a rheumatologic standpoint since the last visit." (Id.). He further noted that Plaintiff was not experiencing any tender or swollen joints. (R. 597).

On August 4, 2011, Plaintiff presented to Dr. Herrmann with complaints of left anterior chest wall pain. (R. 413). When evaluating this pain, Dr. Herrmann ordered X-rays of Plaintiff's thoracic spine "in case [the chest wall pain was] radicular from the thoracic spine." (Id.). The X-rays revealed "[v]ery gentle upper thoracic levoscoliosis" and "[m]oderate [DDD] with narrowing and spurring in the mid-thoracic spine." (R. 415). Subsequently, DDD of the thoracic spine and spurring were added to Plaintiff's list of diagnoses. (R. 410).

On September 15, 2011, Plaintiff presented to Dr. Herrmann, continuing to complain of chest wall pain. (Id.). After an examination, Dr. Herrmann noted that Plaintiff's cervical pain had resolved. (Id.). Dr. Herrmann advised that Plaintiff visit a chiropractor for her chest wall pain. (Id.).

On December 19, 2011, Plaintiff returned to Dr. Herrmann, complaining of low back pain that at times radiated down her legs and feet. (R. 408). After an examination, Dr. Herrmann documented that he did not "find any concerning radicular findings." (Id.). Dr. Herrmann further documented that Plaintiff was receiving treatment from Johnson Chiropractic Clinic for her chest wall and back pain. (Id.; see also R. 588-595).

On December 20, 2011, Plaintiff presented to Gary W. Miller, M.D., of First Settlement Orthopaedics, Inc. ("First Settlement Orthopaedics"), with complaints of bilateral knee pain. (R. 383). Dr. Miller noted that he had performed a partial menisectomy on Plaintiff in 2006 but that he "ha[d] not seen [Plaintiff] for some years." (Id.). Dr. Miller further noted that X-rays of Plaintiff's knees revealed narrowing of her medial joint space. (Id.). Dr. Miller informed Plaintiff that he intended to treat her knee

pain conservatively. (R. 384). With her permission, he injected Depo-Medrol, an anti-inflammatory glucocorticoid, into both of Plaintiff's knees, which she tolerated well. (Id.).

On December 29, 2011, Plaintiff presented to Anil J. Patel, M.D., of Pain Management Center, Inc., after being referred by Dr. Herrmann for an evaluation of her neck and back pain. (R. 380). After an evaluation, Dr. Patel recommended nerve block treatments and reported that she "should be able to help [Plaintiff's] pain condition." (R. 381). Dr. Patel then "proceed[ed] with a therapeutic right sacroiliac joint injection" and documented that Plaintiff could receive further nerve block treatments if needed. (Id.).

On March 27, 2012, Plaintiff returned to Dr. Miller's office. (See R. 392). During this visit, Dr. Miller injected another dose of Depo-Medrol into Plaintiff's right knee, which Plaintiff tolerated well. (Id.). Subsequently, Plaintiff reported that this injection "helped only for a week or two." (Id.).

### 2. Medical History Post-Dating Alleged Onset Date of April 1, 2012

On April 23, 2012, Plaintiff presented to Dr. Herrmann, complaining of ongoing back pain. (R. 401). After an examination, Dr. Herrmann noted that Plaintiff's back pain radiated down her right leg. (Id.). Dr. Herrmann ordered an MRI of Plaintiff's spine, which "showed [DDD] and mild disc height loss with some minimal bulging discs [but n]o evidence of significant stenosis or reason for neurosurgical involvement. (R. 401, 405).

On April 30, 2012, Plaintiff presented to Dr. Brar for her annual examination. (R. 485). After the examination, Dr. Brar documented that "[there was] no significant change from the past visit." (Id.). Dr. Brar further documented that Plaintiff's "symptoms [are] well controlled on current treatment." (Id.).

On May 24, 2012, Plaintiff presented to Dr. Miller for a scheduled appointment. (R. 392). During this appointment, Dr. Miller noted that Plaintiff "is an excellent candidate for visco supplementation," a form of treatment for arthritic knees. (Id.). Dr. Miller further noted that, to complete viscosupplementation, Plaintiff would be required to undergo a series of three injections into each knee. (Id.). Subsequently, Plaintiff agreed to viscosupplementation and received the three injections, which she tolerated well. (R. 393-95).

On May 30, 2012, Bill Johnson, II, D.C., of Johnson Chiropractic Clinic, drafted a report regarding Plaintiff and sent it to Dr. Herrmann. (R. 543). In this report, Dr. Johnson declared that his treatments for Plaintiff's back pain were no longer effective. (Id.). Additionally, Dr. Johnson declared that Plaintiff's nerve block treatments were no longer effective. (Id.). Dr. Johnson, consequently, recommended that Dr. Herrmann explore other treatment options for Plaintiff's back pain. (Id.).

On July 31, 2012, Plaintiff presented to Dr. Herrmann for a scheduled appointment. (R. 405). During this appointment, Plaintiff complained that she experienced occasional muscle spasms and muscle aches. (Id.). After an examination, Dr. Herrmann documented that Plaintiff's back pain "is stable at present." (Id.). He further documented that Plaintiff takes Ultram as needed for her back pain. (Id.).

On August 8, 2012, Plaintiff presented to Dr. Miller, complaining of right knee pain. (R. 640). Dr. Miller ordered an X-ray of Plaintiff's right knee, which "[did] not show collapse of the medial joint." (Id.). For a clearer picture of Plaintiff's knee, Dr. Miller ordered an MRI, which was performed two days later. (Id.). The MRI revealed a "[b]road oblique tear involv[ing] . . . the medial meniscus with associated meniscal cyst," as well

as "[p]atellofemoral joint arthritis . . . with moderate cartilage loss . . . and small subcortical bone cyst formation." (R. 579).

On August 14, 2012, Plaintiff presented to First Settlement Orthopaedics with complaints of right knee pain. (R. 520, 643). Instead of Dr. Miller, however, Plaintiff was examined by Angie Miller, F.N.P.C., O.N.P.C., an orthopedic nurse practitioner ("O.N.P.C. Miller"). (Id.). After reviewing Plaintiff's MRI results, O.N.P.C. Miller diagnosed Plaintiff with a medial meniscus tear and osteoarthritis of the lower leg. (R. 520). O.N.P.C. Miller also reported that Plaintiff "would like to proceed with [an] arthroscopy." (R. 643).

On September 11, 2012, Dr. Miller performed a partial arthroscopic menisectomy of Plaintiff's right knee. (R. 521-22). During the arthroscopy, Dr. Miller noted that the "[a]nterior two-thirds of [the] meniscus [were] good, [but that the] posterior third showed [a] horizontal type tear." (R. 522). Afterwards, Dr. Miller documented that Plaintiff tolerated the procedure well. (Id.).

In October of 2012, Plaintiff presented to O.N.P.C. Miller several times for surgical aftercare. (R. 524-28). On October 4, 2012, O.N.P.C. Miller noted that Plaintiff experienced pain on the medial side of her right knee. (R. 524). O.N.P.C. Miller further noted that a small effusion was present at that site. (R. 525). After an X-ray failed to reveal any abnormalities, O.N.P.C. Miller prescribed "something for pain" and advised Plaintiff to rest and apply ice to her knee. (Id.). On October 17, 2012, O.N.P.C. Miller reported that Plaintiff's right knee was "doing much better" and that Plaintiff no longer complained of medial side pain. (R. 528). However, O.N.P.C. Miller also reported that

Plaintiff blood glucose level and hemoglobin A1c level were elevated, which triggered an evaluation for diabetes mellitus. (Id.).

On October 22, 2012, Plaintiff presented to Dr. Herrmann for an evaluation for diabetes mellitus. (R. 570). After the evaluation, Dr. Herrmann diagnosed Plaintiff with noninsulin-dependent diabetes mellitus. (Id.). Dr. Herrmann "sent [Plaintiff] to diabetic education" and recommended weight loss but reported an intention to solely monitor the condition. (Id.).

On November 14, 2012, Plaintiff presented to O.N.P.C. Miller for a scheduled appointment. (R. 528). After an examination, O.N.P.C. Miller documented that Plaintiff's "leg . . . is doing much better. She states she only has pain when she is up on it a lot or does a lot of activities." (Id.). O.N.P.C. Miller further documented that Plaintiff demonstrated full range of motion of her right knee. (Id.).

On December 6, 2012, Plaintiff presented to Dr. Herrmann, complaining of shortness of breath, coughing and wheezing. (R. 566, 568). Dr. Herrmann documented that Plaintiff has a history of asthma, although he noted that it had previously been stable. (See, e.g., R. 570). After an examination, Dr. Herrmann diagnosed asthmatic bronchitis and prescribed inhalers. (R. 568). He then continued to treat Plaintiff's bronchitis for the next several weeks. (R. 566, 568). On February 5, 2013, Dr. Herrmann updated Plaintiff's diagnoses of bronchitis to "resolved" and of asthma back to "stable." (R. 561).

On March 21, 2013, Plaintiff presented to O.N.P.C. Miller with complaints of right knee pain. (R. 540). Plaintiff stated that the pain had begun suddenly and had been present for approximately six weeks. (Id.). O.N.P.C. Miller examined Plaintiff, noting that

Plaintiff had decreased strength in her right knee and pain with range of motion. (R. 541). To treat the pain, O.N.P.C. Miller injected Toradol into Plaintiff's right knee. (R. 540). Afterwards, O.N.P.C. Miller recommended that Plaintiff wear a knee brace, which she tried for three weeks but stated was ineffective at relieving her pain. (See R. 529).

Plaintiff returned to O.N.P.C. Miller several times in April of 2013 for follow-up appointments. (R. 529-34). On April 11, 2013, Plaintiff complained of right knee pain that was "increasing in severity." (R. 529). During this visit, O.N.P.C. Miller documented that Plaintiff could be suffering from a meniscus tear in her right knee. (R. 530). On April 25, 2013, O.N.P.C. Miller ordered that Plaintiff attend physical therapy sessions. (R. 532). Subsequently, Plaintiff presented to Mountain River Physical Therapy for approximately one month of sessions. (R. 618-31).

Also on April 25, 2013, Plaintiff presented to Dr. Brar for her annual examination. (R. 597). During this visit, Dr. Brar reported that Plaintiff had developed a skin rash that was suspected to be medication-induced and that, as a result, Plaintiff had stopped taking all of her medications. (Id.). Dr. Brar further reported that, because Plaintiff was not taking her prescribed Celebrex, an "amplification of her osteoarthritic symptoms" had occurred. (Id.). However, an examination revealed "no significant change from the . . . examination" Dr. Brar had performed on April 30, 2012. (Id.). Dr. Brar prescribed an analgesic for temporary pain control and instructed Plaintiff to resume her Celebrex once the skin rash resolved. (See R. 596).

On June 6, 2013, Plaintiff presented to Dr. Herrmann for a scheduled appointment. (R. 551). During this appointment, Dr. Herrmann documented that Plaintiff's skin rash had resolved and that she was slowly resuming her prescribed

medications. (Id.). Dr. Herrmann further documented that Plaintiff was prescribed Glucophage for her diabetes. (Id.).

In June of 2013, Plaintiff presented to O.N.P.C. Miller for several scheduled appointments. (R. 534-39). On June 11, 2013, O.N.P.C. Miller ordered an MRI of Plaintiff's right knee, which revealed: (1) an undersurface tear throughout the medial meniscus, with a parameniscal cyst; (2) moderately severe osteoarthritis; (3) a small knee joint effusion and (4) moderate tendinopathy with no associated tendon tear. (R. 536, 581). On June 25, 2013, Plaintiff reported that her right knee pain was decreasing in severity but that "[s]he would like to proceed with arthroscopy for medial menisectomy." (R. 537, 539, 643). Subsequently, O.N.C.P. Miller scheduled the arthroscopy. (R. 643).

On August 5, 2013, Plaintiff presented to O.N.P.C. Miller, complaining of escalating right knee pain. (R. 654-56). After an examination of Plaintiff's right knee, O.N.P.C. Miller noted tenderness at the patella, a mild decrease in strength and pain with range of motion. (Id.). However, O.N.P.C. Miller further noted that no instability was present and that Plaintiff's gait, station and coordination were normal. (R. 655-56).[2]

### 3. Medical Reports/Opinions

#### a. Disability Determination Explanation by Henry Scovern, M.D., December 23, 2011

---

[2] When Plaintiff submitted additional medical records, dated December 19, 2013, through May 14, 2014, the Appeals Council made the documents a part of the record. (R. 5-105). As the Appeals Council noted, however, the ALJ "decided [Plaintiff's] case through November 20, 2013. This new information is about a later time . . . [and] does not affect the decision about whether [Plaintiff] was disabled beginning on or before November 20, 2013." (R. 2). Although Plaintiff's counsel at times refers to these medical records, Plaintiff has not challenged the Appeals Council's decision with this Court. Therefore, these medical records will not be discussed at this time.

Henry Scovern, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial level (the "Initial Explanation"). (R. 140-47). Prior to drafting the Initial Explanation, Dr. Scovern reviewed Plaintiff's medical records, treatment notes, Work History Report, Personal Pain Questionnaire and Adult Function Report. (R. 141-42). After reviewing these documents, Dr. Scovern concluded that Plaintiff suffers from the following severe medical impairments: DDD and osteoarthritis. (R. 143). Dr. Scovern further concluded that Plaintiff's statements regarding her symptoms and limitations are only "partial[ly] credible because they are not consistent with [her] reported activity level or the objective medical evidence." (R. 145). Specifically, Dr. Scovern found that "[t]here is no evidence for [rheumatoid arthritis], persistent knee issues or [osteoarthritis] except modest axial skeletal abnormalities." (Id.).

In the Initial Explanation, Dr. Scovern completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 144-45). During this assessment, Dr. Scovern found that, while Plaintiff possesses no postural, manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional limitations. (Id.). Regarding these exertional limitations, Dr. Scovern found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 144).

Dr. Scovern also reviewed Plaintiff's relevant work history in the Initial Explanation. (R. 145-46). Dr. Scovern noted that Plaintiff has worked as a secretary,

cashier and, most recently, an office assistant. (R. 145). After reviewing these positions, Dr. Scovern determined that Plaintiff is able to perform her past relevant work. (R. 146). In his reasoning, Dr. Scovern noted that the "evidence shows that [Plaintiff] has some limitations in the performance of certain work activities; however, these limitations would not prevent [Plaintiff] from performing past relevant work as [a] secretary." (Id.).

### b. Disability Determination Explanation by Porfirio Pascasio, M.D., April 24, 2012

Porfirio Pascasio, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level. (R. 149-57). Prior to drafting this explanation, Dr. Scovern reviewed the same documents that Dr. Scovern had reviewed in addition to updated medical records submitted by Plaintiff's counsel. (R. 150-52). After reviewing these documents, Dr. Pascasio agreed with Dr. Scovern's conclusions that: (1) Plaintiff is only partially credible; (2) Plaintiff's DDD and osteoarthritis constitute severe impairments and (3) Plaintiff is capable of performing her past relevant work. (R. 153-54, 156).

However, Dr. Pascasio's RFC assessment differed from Dr. Scovern's in two principal ways. (See R. 144-45, 154-55). First, regarding Plaintiff's exertional limitations, Dr. Pascasio found that Plaintiff is able to occasionally lift and/or carry twenty-five pounds instead of twenty pounds. (R. 154). Second, Dr. Pascasio found that Plaintiff possesses postural and environmental limitations in addition to exertional limitations. (R. 154-55). Concerning Plaintiff's postural limitations, Dr. Pascasio found that Plaintiff is not able to climb ladders, ropes or scaffolds and is able to occasionally climb stairs or ramps, balance, stoop, kneel, crouch and crawl. (Id.). As for Plaintiff's environmental limitations, Dr. Pascasio found that Plaintiff must avoid concentrated exposure to

hazards, although he further found that she need not avoid exposure to extreme cold, extreme heat, wetness, humidity, noise, vibrations or "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 155). On July 3, 2012, Thomas O. Thomson, M.D., reviewed Dr. Pascasio's RFC assessment and concurred with his findings. (R. 400).

## C.    Testimonial Evidence

At the administrative hearing held on October 30, 2013, Plaintiff testified that she suffers from knee pain. (R. 126). Plaintiff states that she has undergone three knee surgeries in the past. (R. 126-27). In 2005, Plaintiff underwent surgery for a meniscus tear in her left knee. (R. 126). However, due to a surgical complication, "[the surgeon] had to go back in and re-fix it" that same year. (Id.). Subsequently, in October or November of 2012, Plaintiff underwent surgery for a meniscus tear in her right knee. (R. 126-27). Plaintiff states that her knee pain started at this time. (R. 126).

Plaintiff testified regarding the quality of her knee pain. (R. 127-28). She states that the pain is constant but that she utilizes measures to make the pain tolerable. (R. 128). For example, Plaintiff states that "[i]f I baby it[,] . . . [the pain] gets better." (R. 127). Plaintiff explains that to "baby it" means to keep her knee elevated and to alternate ice and heat. (R. 127-28). When she climbs or descends stairs, Plaintiff describes her pain as feeling "like the bone's going to come out the side of my knee." (R. 128). Although the pain is constant, Plaintiff states that her pain is "better in the summer months when it's warm." (Id.). To illustrate, Plaintiff states that "in July I think there [were] . . . three days, four days, [that I did not feel pain] . . . but not all in the same week." (Id.).

Plaintiff testified that she has sought treatment for her knee pain. (R. 127). Plaintiff states that she has received cortisone injections to treat her knee pain but that

"[they] didn't work." (Id.). Plaintiff further states that on October 10, 2013, she presented to Dr. Miller regarding her knee pain. (Id.). Plaintiff explains that Dr. Miller ordered an MRI and "found . . . several things [wrong] with the knee," including osteoarthritis, a cyst and "two different types of tears in [the] meniscus." (Id.). However, Plaintiff was informed that "[they had] done all [they] can" to treat her knee pain. (Id.).

In addition to knee pain, Plaintiff testified that she suffers from back and neck pain. (R. 131-32). Regarding her back pain, Plaintiff states that she has arthritis and that her vertebrae "are shoving down on each other." (R. 131). To treat her back pain, Plaintiff has received cortisone injections in her back. (See R. 127, 131-32). Additionally, Plaintiff has participated in physical therapy sessions, although she describes the sessions as ineffective. (Id.). Excluding cortisone injections and physical therapy, Plaintiff states that she has not received any treatment for her back pain because "there's . . . [nothing to] be done." (R. 132). As for her neck pain, Plaintiff states that she experiences a "pull[ing]" in her neck when she lifts ten pounds. (Id.). Plaintiff further states that she has received cortisone injections for her neck pain. (See R. 127, 131-32).

Plaintiff testified that she routinely presents to a rheumatologist to treat her joint pain. (See R. 135). Plaintiff stated that she presented to her rheumatologist, Dr. Brar,[3] in April of 2012 and in April of 2013. (Id.). In April of 2012, Dr. Brar "found that all [her] joints were normal and [that] there were no . . . indications of any problems with [her joints]." (Id.). In April of 2013, Dr. Brar reported that "there was really no change from the year before." (Id.).

---

[3] While Plaintiff testified that "Dr. Barr" is her rheumatologist, the undersigned assumes that Plaintiff intended to reference Dr. Brar.

Plaintiff described how her knee, back and neck pain limit her daily activities. (R. 129-31). For example, Plaintiff has difficulty lifting, standing and walking. Regarding her lifting ability, Plaintiff states that she has difficulty lifting objects that weigh ten pounds or more. (R. 132). Regarding her standing ability, Plaintiff states that she is able to remain standing for no longer than ten minutes, requiring her to take frequent breaks from any activities that she performs. (R. 129). Plaintiff explains that her ability to remain standing has worsened over time and that, in 2012, she was able to stand for twenty to twenty-five minutes at a time. (R. 129-30). As for her walking ability, Plaintiff states that she is able to walk only twenty-five feet before requiring rest, although she explains that "[her] walking is about the same" as it was in 2012. (R. 130-31). While Plaintiff is able to walk without an assistive device, Plaintiff states that her pain occasionally causes her to lose her balance and fall. (R. 130).

Despite these limitations, Plaintiff testified that she is able to care for her family. (R. 134-35). For instance, Plaintiff helped her siblings provide care to their mother after she "had open-heart surgery in January [of 2013]." (R. 134). Plaintiff's role included cleaning her mother's house once a week and occasionally sweeping and vacuuming floors and preparing meals, although she required intermittent rest before completing tasks. (R. 134-35). Plaintiff also babysits her grandchildren on occasion for an eight-hour period. (R. 133). Plaintiff explains that when she babysits, she is able to sit on the floor for "five minutes at a time" but is unable to crawl. (Id.).

**D.  Vocational Evidence**

   **1.  Vocational Testimony**

Nancy Shapero, an impartial vocational expert, also testified at the administrative hearing. (R. 135-39, 219). Initially, Ms. Shapero analyzed Plaintiff's past relevant work. (R. 136-37). Regarding Plaintiff's most recent employment position as an office assistant, Ms. Shapero characterized the work as "light[,] . . . SVP: 3, no transferable skills." (Id.). Regarding Plaintiff's prior work as a cashier for Wal-Mart Stores, Inc., Ms. Shapero characterized the position as "light work, SVP: 3 and sometimes she performed this up to medium work with no transferable skills." (R. 137). Ms. Shapero then gave the following response to a hypothetical question posed by the ALJ:

> Q:     [A]ssume an individual the claimant's age, education and work history who can perform work at the light exertional level, [but with the following limitations:]
>
> [W]ho can occasionally climb ramps and stairs, but never ladders, ropers or scaffolds. Who can occasionally balance, stoop, knee, crouch and crawl and who must avoid concentrated exposure to extreme cold and extreme heat, vibration[s] and hazards such as moving machinery and unprotected heights. Could such an individual perform the claimant's past work?
>
> A:     Yes, Your Honor.

(Id.). The ALJ subsequently repeated his question, asking Ms. Shapero to consider an individual with the same qualifications but who is able to perform work at the sedentary exertional level only. (Id.). Ms. Shapero responded that such an individual could not perform Plaintiff's past work. (Id.). Ms. Shapero testified that her testimony is consistent with the Dictionary of Occupational Titles ("DOT"). (R. 135-36).

Plaintiff's counsel, Ms. Hinzman, also presented a hypothetical question to Ms. Shapero. (R. 138). Ms. Hinzman asked that Ms. Shapero consider an individual who must alternate between sitting and standing every fifteen minutes. (Id.). Ms. Shapero testified that this limitation was not recognized in the DOT but that, if such an individual

was unproductive for twenty percent of the workday, then that individual would not be employable. (Id.).

**2. Work History Reports & Disability Reports**

On November 14, 2011, Josephine King, of Jan Dils Attorneys at Law LC, completed a Disability Report for Plaintiff. (R. 241-52). In the report, Ms. King indicated that the following medical conditions impact Plaintiff's ability to work: (1) scoliosis of the spine; (2) arthritis in the back and knees; (3) bone spurs in the spine and neck; (4) osteoarthritis; (5) rheumatoid arthritis and (6) pain throughout both legs. (R. 244). She stated that Plaintiff stopped working on June 29, 2008, "[b]ecause of [her] condition[s]." (Id.). She further stated that on June 15, 2004, before Plaintiff stopped working, Plaintiff's medical conditions "cause[d] [her[ to make changes in [her] work activity," although no elaboration was provided. (Id.). Finally, Ms. King stated that Plaintiff takes the following medications for her medical conditions: Advair, Celebrex, Crestor, Flexeril, Prilosec, tramadol and Valtrex. (R. 247).

On November 28, 2011, Plaintiff completed a Work History Report. (R. 261-68). In the report, Plaintiff indicated that she has worked as a secretary, sewing machine operator, cashier and, most recently, an office assistant/cashier for Foodliner, Inc. (R. 261). When describing the duties of her most recent position, Plaintiff stated that she performed general office work, operated the cash register, executed money orders, cashed paychecks for customers, registered vendors, bagged groceries and occasionally carried groceries to customers' vehicles. (R. 262). She explained that the position required her to frequently lift twenty-five pounds and to stand, kneel, crouch and handle large objects for at least six hours daily. (Id.). Plaintiff further explained that

she was required to walk for four hours, sit for two hours, stoop for one hour and reach out with her arms and handle small objects for a total of eight hours daily. (Id.).

Plaintiff's counsel Jan Dils submitted two Disability Report-Appeal forms. (274-78, 279-85). On January 18, 2012, Ms. Dils reported that Plaintiff's symptoms and limitations had worsened. (See R. 276). Specifically, Ms. Dils reported that Plaintiff is no longer able to bend over, "lift anything[,] . . . [or] walk or stand for any period of time." (Id.). Ms. Dils explained that, due to this deterioration, Plaintiff now requires assistance putting on pants, socks and shoes. (Id.). Ms. Dils also updated Plaintiff's list of medications to include only Celebrex, Crestor, Flexeril, Prilosec and tramadol. (Id.).

On May 14, 2012, Ms. Dils reported that Plaintiff's pain had increased, beginning on or around April 1, 2012. (R. 279-85). Due to this increased pain, Ms. Dils declared that Plaintiff's mobility is more limited than previously described. (Id.). Additionally, Ms. Dils declared that Plaintiff requires more time to complete tasks as well as frequent breaks and that she has difficulty "reading and looking at [a] computer." (R. 283). Finally, Ms. Dils reiterated that Plaintiff is unable to bend over, walk or stand for any amount of time. (Id.).

## E.    Lifestyle Evidence

On November 28, 2011, Plaintiff completed a Personal Pain Questionnaire and an Adult Function Report. (R. 253-60, 269-73). In the Personal Pain Questionnaire, Plaintiff states that she suffers from pain in her back, legs, neck and shoulders. (R. 269-71). Regarding her back pain, Plaintiff characterizes the pain as aching, throbbing and continuous in nature, although she describes some days as worse than others. (R. 269). On "a bad day," Plaintiff declares that she will "lay around" and forego physical activity.

(Id.). When discussing aggravating and mitigating factors, Plaintiff states that walking and standing worsen her pain and that lying down and applying an ice pack or heating pad to her back relieves her pain. (Id.). Plaintiff takes tramadol and Celebrex for the pain, the former of which she describes as sometimes effective and the latter of which she describes as never effective. (R. 270). Plaintiff reports, however, that tramadol causes headaches and "makes [her] non-functional." (Id.).

Regarding her bilateral leg pain, Plaintiff characterizes the pain as aching, throbbing and continuous in nature. (Id.). She compares her leg pain to the pain caused by a headache and states that she "call[s] it a migrane [sic] of the legs." (R. 271). To relieve her pain, Plaintiff elevates her legs and either applies a heating pad or wraps her legs in a blanket for warmth. (Id.). She takes Aleve and tramadol for the pain, which she describes as sometimes effective. (Id.).

Finally, regarding her neck and shoulder pain, Plaintiff characterizes the pain as aching, throbbing, cramping and continuous in nature, although she states that she has "a few good days [each] month." (R. 271-72). On her good days, however, Plaintiff states that she over-exerts herself and then is "right back where [she] was[, which is i]n pain." (Id.). She further states that the pain gets "real [sic] bad at times." (R. 272). While she is unsure of the exact cause, she believes that the pain is arthritis pain. (Id.). To relieve her pain, she applies ice packs to her neck and shoulders. (Id.). She takes Aleve and tramadol for the pain, which she describes as sometimes effective. (Id.).

In the Adult Function Report, Plaintiff states that she is limited in her ability to work because she has difficulty standing for an extended period of time, sitting, lifting and bending over at the waist. (R. 253). She describes her typical morning as reading

the Bible and making her bed. (R. 254). Then, throughout the day, she prepares meals, reads the news on her computer, walks to the mailbox, sews and cares for the family dog and cat, although her husband assists with pet care. (R. 254, 256). She also performs housework, which may include washing laundry, vacuuming or dusting. (R. 254). Plaintiff explains that she "spread[s] [the] housework over the whole week" so that she does not over-exert herself. (Id.).

Plaintiff reports that she possesses physical limitations that restrict her ability to perform certain activities. (See R. 254-58). Despite these limitations, however, Plaintiff declares that she requires no or minimal assistance in a number of activities. (See id.). For example, Plaintiff performs her own personal care and is able to operate a motor vehicle and leave the house without accompaniment. (R. 254, 256). She also has no difficulty handling money and is able to pay bills, count change, handle a savings account and use a checkbook. (Id.). Finally, Plaintiff is able to prepare her own meals, go shopping once a week, walk for one mile before requiring rest and perform household chores such as "cleaning, laundry [and] mak[ing] [the] bed." (R. 255-56, 258).

While Plaintiff is able to perform some activities, others prove more difficult due to her physical limitations. (See R. 254-58). For example, Plaintiff has difficulty lifting, squatting, bending, standing for more than a half-hour, reaching out with her arms, walking, sitting, kneeling, climbing stairs and lifting items heavier than fifteen pounds. (R. 258). She is unable to walk for long distances, mow the lawn or work in her garden, although she "tr[ies] to keep the weeds out of [the] flower bed." (R. 254-55). She is also unable to read or sew for long periods of time due to her neck and shoulder pain and has difficulty falling asleep at night due to her knee and back pain. (R. 254, 257).

Although she possesses physical limitations, Plaintiff denies possessing mental

limitations. (See R. 257-59). Plaintiff socializes well with others and regularly attends

church, drives to the store and visits her grandchildren. (R. 257). She also handles

stress and changes to her routine well and has no difficulty following directions,

completing tasks or concentrating. (R. 258-59).

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following

criteria:

> [The] individual . . . [must have a] physical or mental impairment or
> impairments . . . of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work. . . .
> '[W]ork which exists in the national economy' means work which exists in
> significant numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following

five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your
> impairments(s). If you have an impairment(s) that meets or equals one of
> our listings . . . and meets the duration requirement, we will find that you
> are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since June 29, 2008,[4] the alleged onset date (20 CFR 404.1571 *et seq.*).

---

[4] While the ALJ noted that Plaintiff had "amended her onset date to April 1, 2012," the ALJ continued to consider Plaintiff's former date of onset in his decision. (See R. 111-118) (explaining that, while Plaintiff's former onset date would still be considered, "the majority of this decision will center around findings from [April 1, 2012,] forward").

3.      The claimant has the following severe impairments: [DDD] and osteoarthritis (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ramps [or] scaffolds. She must [also] avoid concentrated exposure to extreme cold, extreme heat, vibration[s] and hazards.

6.      The claimant is capable of performing past relevant work as an office assistant/cashier. This work does not require the performance of work-related activities precluded by the claimant's [RFC] (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2008, through the date of this decision (20 CFR 404.1520(f)).

(R. 113-18).

## VI.      DISCUSSION

### A.      Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff asserts that: (1) the ALJ erred in assessing Plaintiff's credibility; (2) the ALJ's finding that Plaintiff is able to perform the standing, walking and lifting requirements of light exertional work is not supported by substantial evidence and (3) the ALJ failed to consider Plaintiff's non-severe impairments when determining the RFC. (Pl.'s Br. at 7). Plaintiff contends that the ALJ's errors warrant reversal of the Commissioner's decision. (Id. at 17).

Alternatively, Defendant asserts in her Motion for Summary Judgment that the Commissioner's decision "is supported by substantial evidence." (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant asserts that the ALJ: (1) reasonably evaluated Plaintiff's subjective complaints when assessing her credibility; (2) reasonably limited Plaintiff to a reduced range of light work and (3) considered all of Plaintiff's credible limitations in the RFC. (Def.'s Br. at 8, 12, 15). Defendant requests that the Court affirm the Commissioner's decision. (Id. at 16).

**B.      Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). However, "[i]n reviewing for substantial evidence, [a court must] not undertake

to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.   Whether the ALJ Erred in Determining Plaintiff's Credibility**

Plaintiff asserts that the ALJ's determination that Plaintiff is "not entirely credible" is not supported by substantial evidence for two reasons. (Pl.'s Br. at 14-15). First, Plaintiff contends that "the ALJ did not make his reasoning 'sufficiently specific[]' as to which statements he considered or what weight he gave those statements." (<u>Id.</u> at 14). Second, Plaintiff argues that "the ALJ based his credibility assessment on improper factors and failed to consider all of the factors required by" SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). (<u>Id.</u> at 15). Alternatively, Defendant contends that the ALJ reasonably evaluated Plaintiff's subjective complaints and provided valid reasons for discounting Plaintiff's statements. (Def.'s Br. at 12).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." <u>See</u> <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996); <u>see also</u> 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. <u>See</u> <u>Craig</u>, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. <u>Id.</u>

Social Security Ruling 96-7p sets out several factors for an ALJ to consider when

assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. In fact, if the ALJ meets his or her basic duty of explanation, then the "ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No.

3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)). This Court has even declared that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (citation omitted).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 115). First, the ALJ determined that Plaintiff has proved that she suffers from medical impairments capable of causing the symptoms alleged, including: DDD, osteoarthritis, diabetes mellitus and asthma. (R. 113, 115). Second, the ALJ examined the factors outlined in SSR 96-7p when assessing the credibility of Plaintiff's subjective allegations in light of the entire record. (See R. 115-18).

### a. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making his credibility determination. Specifically, the ALJ noted that Plaintiff performs her own personal care, sews, prepares meals and reads the news and her Bible every day. (R. 117). The ALJ further noted that Plaintiff performs household chores every day, including washing laundry, tidying up and vacuuming, although he acknowledged that Plaintiff "spread[s] these activities out throughout the week." (Id.). Finally, the ALJ noted that Plaintiff is able to operate a motor vehicle and go shopping independently and that she has helped provide care to her ailing mother. (Id.). After reviewing these activities, the ALJ determined that Plaintiff's activity level is "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Id.).

Plaintiff challenges the ALJ's analysis of her daily activities, arguing that the

activities were "so relatively low-exertion and spread over her own discretionary length of time that they cannot possibly be considered substantial evidence for the ALJ's finding, if [they are] even relevant at all to the issue of whether [Plaintiff] could stand and walk [six] hours in an [eight]-hour workday." (Pl.'s Br. at 15). Plaintiff's argument fails for several reasons. First, the ALJ analyzed Plaintiff's daily activities to determine whether her activity level is consistent with her subjective complaints. (R. 115-18). The ALJ did not compare Plaintiff's activity level to the duties required of a full-time job. (Id.). Second, SSR 96-7p explicitly states that a claimant's daily activities are relevant when evaluating a claimant's credibility. SSR 96-7p, 1996 WL 374186 at *3. Finally, Plaintiff's daily activities constitute only one factor, not the sole basis, of the ALJ's credibility assessment. (R. 115-18).

Plaintiff further argues that "the ALJ applied the wrong standard of disability in his [credibility] analysis." (Pl.'s Br. at 15). Specifically, Plaintiff argues that she "[only] had to be limited to sedentary jobs . . . to be disabled under [the] Social Security [R]egulations," not "totally disabled." (Id.). Again, Plaintiff's argument fails. In his credibility analysis, the ALJ documented that Plaintiff "alleg[es to suffer from] totally disabling symptoms" and proceeded to note evidence that undermined her credibility. (R. 115-18). The ALJ did not, however, require Plaintiff to be totally disabled. (R, 113). To the contrary, the ALJ specifically stated that if Plaintiff "is unable to do any past relevant work," which he characterized as light work, then "the analysis proceeds" toward a potential finding of "disabled." (Id.). Therefore, the ALJ applied the proper legal standard and Plaintiff's argument is without merit.

b.    **Plaintiff's Pain and Other Symptoms**

The ALJ also discussed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two). Regarding Plaintiff's pain, the ALJ documented that Plaintiff principally suffers from knee and back pain. (R. 115-18). When discussing Plaintiff's knee pain, the ALJ noted that Plaintiff complained of increased knee pain to Dr. Brar in April of 2012,[5] to O.N.P.C. Miller on April 11, 2013, and to a physical therapist on May 29, 2013. (R. 116). The ALJ further noted that, despite Plaintiff's testimony "at the hearing . . . [that] she would have additional surgical intervention," O.N.P.C. Miller reported in August of 2013 that Plaintiff's gait, station and coordination were normal.[6] (Id.).

When discussing Plaintiff's back pain, the ALJ noted that, on August 27, 2009, Dr. Lin advised Plaintiff to maintain her levels of activities and functioning, despite X-rays revealing mild degenerative changes in the lumbar spine and gentle upper thoracic levoscoliosis. (Id.). The ALJ further noted that the "record . . . identifies multiple visits in which [Plaintiff] did not complain of back pain, suggesting [that] this issue, at least at times, has not been as severe as alleged." (Id.). Finally, the ALJ noted "the lack of

---

[5] Specifically, the ALJ noted that, while Plaintiff had complained of increased knee pain to Dr. Brar, Dr. Brar's physical examination revealed "no swollen joints and no tender points." (R. 116). Plaintiff argues that the ALJ erred in "cit[ing] primarily . . . a rheumatologist that [Plaintiff] only sees once a year for an autoimmune disease . . . as evidence for why [Plaintiff's] knee complaints were not credible." (Pl.'s Br. at 14). Dr. Brar's physical examinations, however, focused on Plaintiff's joints and always included specific findings regarding her knees. (See, e.g., R. 597). Furthermore, no evidence exists that the ALJ rejected other medical evidence in favor of Dr. Brar's findings. Instead, the ALJ cited Dr. Brar's findings as one factor in his credibility assessment while also citing treatment notes from First Settlement Orthopaedics and Mountain River Physical Therapy. (R. 115-18).

[6] Plaintiff argues that the ALJ erred in finding Plaintiff's "testimony regarding [her upcoming] knee replacement surgery . . . not credible . . . even though [Plaintiff's] representative fully informed the ALJ at the . . . hearing of plans for an upcoming knee replacement surgery." (Pl.'s Br. at 14-15). While the ALJ did leave "the record open" for documents regarding an additional surgery, Plaintiff did not undergo the surgery until May 14, 2014, which is outside of the relevant time period for Plaintiff's claim for DIB. (R. 124). The ALJ, therefore, did not need to give credence or even acknowledge Plaintiff's knee replacement surgery. If Plaintiff desires that the surgery be considered, then she must file a new claim for DIB. (R. 2).

testimony and complaints regarding [Plaintiff's back pain] during the hearing." (Id.).

Plaintiff argues that the ALJ erred in using the lack testimony and complaints regarding her back pain against her for two reasons. (Pl.'s Br. at 15). First, Plaintiff contends that the ALJ "specifically directed [Plaintiff's] representative to focus her questioning on [Plaintiff's] knee impairment." (Id.). Second, Plaintiff contends that her hearing testimony "did include a description of pain, limitations, and treatment related to her back." (Id.). During the hearing, Plaintiff's counsel asked the ALJ "what [he] would like [her] to . . . focus [her] questioning on." (R. 125). The ALJ responded by stating that Plaintiff's knee impairment appeared to be a significant issue and to "cover that." (Id.). Plaintiff's counsel, however, was not limited to the subject of Plaintiff's knee impairment but was provided an opportunity to fully question Plaintiff regarding all of her impairments and associated limitations. (See R. 125-35). Therefore, the ALJ reasonably assumed that, if Plaintiff's back pain was a significant issue in her claim for DIB, Plaintiff's counsel would have questioned Plaintiff regarding the associated symptoms and limitations. Moreover, the ALJ did not ignore the testimony that Plaintiff did provide regarding her back pain. (R. 116). Instead, the ALJ only implied that, if Plaintiff's back pain was a significant issue, he would expect more testimony and subjective complaints regarding it. (See R. 115-18).

As for Plaintiff's other symptoms, the ALJ noted that Plaintiff testified that "sitting [is] an issue" for her and that she is unable to walk further than twenty-five feet. (R. 115). However, the ALJ documented that "the record does not contain any opinions from treating or examining physicians indicating that [Plaintiff] . . . has limitations greater than those determined in this decision." (R. 117). The ALJ further documented that,

"[g]iven [Plaintiff's] allegations of totally disabling symptoms, one [would] expect to see some indication in the treatment records of restrictions placed on [her] by [a] treating doctor[,] [y]et a review of the record . . . reveals no [such] restrictions." (Id.).

### c. Precipitating and Aggravating Factors

Additionally, the ALJ discussed factors that precipitate and aggravate Plaintiff's pain and other symptoms (factor three). In particular, the ALJ noted that physical activity worsens Plaintiff's pain and other symptoms. (See R. 116). For example, the ALJ documented that providing care to her mother in addition to "caring for her own house . . . aggravated [Plaintiff's] knees." (Id.). However, the ALJ further noted that Plaintiff consistently reported during her physical therapy sessions in April of 2013 that her pain level remained between a zero and a five on a scale of one through ten during her sessions. (Id.).

### d. Plaintiff's Pain Medication

The ALJ reviewed the medication that Plaintiff is prescribed for her pain (factor four). Specifically, the ALJ documented that Plaintiff is prescribed Celebrex for pain. (R. 116). The ALJ further documented that, excluding a brief time period in which Plaintiff ceased taking her medications due to a skin rash, Plaintiff has taken her Celebrex as prescribed. (See id.).

### e. Other Treatment and Measures Used to Relieve Pain

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for pain relief (factor five) and the measures Plaintiff uses to relieve her pain (factor six). Regarding the treatment that Plaintiff has received for pain, the ALJ highlighted several facts. First, the ALJ noted that Plaintiff underwent arthroscopic

surgery on both of her knees, was scheduled for a right partial knee replacement following the administrative hearing and received "injection therapy," physical therapy and chiropractic treatment for her knee and back pain. (R. 115-16). Second, the ALJ noted that Plaintiff's pain treatment has generally been conservative in nature and successful at controlling her pain, resulting in pain levels as low as zero on a scale of one through ten. (R. 116). Finally, the ALJ noted that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (Id.). As for measures Plaintiff uses to relieve her pain, the ALJ noted that Plaintiff spreads out her activities throughout the week so that her pain remains at manageable levels. (R. 117).

### f.  Work History

Finally, the ALJ discussed Plaintiff's work history. Specifically, the ALJ noted that: (1) Plaintiff "had no earnings" from 1997 to 1999; (2) Plaintiff's earnings were low from 2000 to 2002; (3) Plaintiff's earnings were "somewhat low" from 2004 to 2008 and (4) Plaintiff had no earnings after 2008. (R. 117). After reviewing Plaintiff's history of low earnings, the ALJ determined that "[t]he multiple years documented with no earnings prior to the alleged onset date . . . raise questions as to whether or not [Plaintiff's] current unemployment is actually the result of a medical condition." (Id.).

### g.  Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is based on proper factors and is sufficiently specific[7] to make clear his reasoning in finding Plaintiff not entirely

---

[7] Plaintiff had argued that the ALJ's reasoning is not sufficiently specific because the ALJ cited Dr. Brar's treatment notes without addressing why treatment notes from Dr. Miller or

credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned finds that the ALJ's credibility determination is supported by substantial evidence and accords it the great weight to which it is entitled.

### 2.  Whether the ALJ Erred in Determining Plaintiff's RFC

Plaintiff asserts two issues regarding the ALJ's RFC determination that Plaintiff is able to perform light work with certain limitations. (R. 115). First, Plaintiff argues that the "finding that [Plaintiff is able to] perform the standing, walking, and lifting requirements of light exertional work is not supported by substantial evidence." (Pl.'s Br. at 8). Second, Plaintiff argues that the ALJ failed to "consider [Plaintiff's] non-severe impairments in [the] RFC finding." (Id. at 16).

### a.   Whether the ALJ's Determination that Plaintiff is able to Perform Light Exertional Work is Supported by Substantial Evidence

In arguing that the ALJ's RFC determination is not supported by substantial evidence, Plaintiff claims that the ALJ erred in reaching certain conclusions in his reasoning. (Id. at 8, 10). Additionally, Plaintiff claims that the RFC determination is based on an inadequate study of the record. (Id. at 9, 11).

### i.    Whether the ALJ Erred in his Reasoning

Plaintiff contends that the ALJ erred in his reasoning, "leaving nothing that could be considered an adequate rationale to a reasonable person." (Pl.'s Br. at 9). Specifically, Plaintiff contends that the ALJ erred in reaching certain conclusions "in his

---

Plaintiff's chiropractor were not discussed. (Pl.'s Br. at 14). The ALJ's reasoning, however, sets forth a discussion of the evidence and the reasons for his decision, which were all the ALJ was required to provide. See Part VI.C.2 (stating that an ALJ is not obligated to comment on every piece of evidence presented but is instead required only to provide a minimal level of analysis that enables a reviewing court to track the ALJ's reasoning).

[s]tep [t]hree analysis." (Id. at 10). Defendant counters by arguing that the ALJ

reasonably determined Plaintiff's RFC. (Def.'s Br. at 8).

Prior to step four of the sequential evaluation process, the ALJ must determine

the claimant's RFC. 20 C.F.R. § 404.1520. The "ultimate responsibility for determining

a[n] . . . RFC is reserved for the ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F.

Supp. 2d 828, 835 (N.D. W. Va. 2009). The RFC is what a claimant "can still do despite

[his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). More specifically, the RFC is

"[a] medical assessment of what an individual can do in a work setting in spite of the

functional limitations and environmental restrictions imposed by all of his or her

medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x. 264, 272 (4th Cir.

2015). When determining an RFC, the ALJ initially "assess[es] the nature and extent of

[the claimant's] physical limitations." 20 C.F.R. § 404.1545(b). Depending on those

limitations, the claimant may then be found capable of performing sedentary, light,

medium, heavy or very heavy work. 20 C.F.R. § 404.1567 (2015). Light work involves:

> [L]ifting no more than [twenty] pounds at a time with frequent lifting or
> carrying of objects weighing up to [ten] pounds. Even though the weight
> lifted may be very little, a job is in this category when it requires a good
> deal of walking or standing, or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls. To be considered
> capable of performing a full or wide range of light work, you must have the
> ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

In the present case, the ALJ determined that Plaintiff "has the [physical RFC] to

perform light work . . . except [that] she [may] occasionally climb ramps and stairs,

balance, stoop, kneel, crouch and crawl[] but [may] never climb ladders, ramps and

scaffolds." (R. 115). To support this finding, the ALJ pointed to the same evidence that

he used to support his credibility finding. (R. 115-18). Moreover, the ALJ referenced Plaintiff's Disability Determination Explanations, both at the Initial and Reconsideration levels. (R. 117-18). Specifically, regarding Plaintiff's Disability Determination Explanation at the Initial level, the ALJ noted Dr. Scovern's finding that Plaintiff is capable of lifting twenty pounds occasionally and ten pounds infrequently, sitting for six hours in an eight-hour work day and standing and walking for six hours in an eight-hour work day. (R. 117). Regarding Plaintiff's Disability Determination Explanation at the Reconsideration level, the ALJ noted Dr. Pascasio's finding that Plaintiff is capable of lifting twenty-five pounds occasionally and ten pounds infrequently, sitting for six hours in an eight-hour work day and standing and walking for six hours in an eight-hour work day. (R. 118). Finally, the ALJ emphasized two facts. (R. 117). First, the ALJ emphasized that no treating physician has placed any restrictions upon Plaintiff's activities or has reported that Plaintiff suffers from functional limitations "greater than those determined in this decision." (Id.). Second, the ALJ emphasized that Plaintiff had been encouraged by Dr. Lin in March of 2008 to "maintain [her] . . . level of activities and functioning." (Id.).

Plaintiff first challenges the ALJ's RFC determination by arguing that the ALJ erred in "giv[ing] weight to the [s]tate agency non-examining physician opinions . . . [because they] were not based on the entire record . . . [and] were given prior to [Plaintiff's] amended onset date." (Pl.'s Br. at 12). However, the Code of Federal Regulations states that ALJs "*must* consider findings and other opinions of [s]tate agency medical . . . consultants," even though that ALJs are not bound to those findings or opinions. 20 C.F.R. § 404.1527(e) (2012) (emphasis added). Therefore, the ALJ was

obligated to examine the Disability Determination Explanations. Furthermore, after his examination of the explanations, the ALJ determined that "in a case like this . . . there exist a number of reasons to reach similar conclusions" as the state agency medical consultants. (R. 117). Given the lack of contrary medical opinion evidence and the ALJ's finding that treatment notes written by Dr. Brar, O.N.P.C. Miller, Dr. Lin, Mountain River Physical Therapy and Johnson Chiropractic Clinic confirm the opinions of the state agency medical consultants, the ALJ did not err in giving weight to the state agency medical consultants' opinions.

Next, Plaintiff argues that the ALJ's reasoning is flawed because the ALJ stated that "there are multiple progress notes showing minimal to no positive findings for osteoarthritic findings." (Pl.'s Br. at 10). Specifically, Plaintiff argues that this statement is "unfounded and ignored the overwhelming evidence." (Id.). Plaintiff, however, uses this statement out of context. The ALJ made this statement at step three of the sequential evaluation process to support his determination that Plaintiff "does not have an impairment or combination of impairments" that automatically qualifies her for DIB, a determination that Plaintiff does not contest upon review. (R. 114). The ALJ did not use this statement to support his RFC assessment, in which he focused on Plaintiff's functional limitations and not the severity of her impairments. (See R. 115-18).

Moreover, Plaintiff's argument is without merit. First, Plaintiff challenges the statement by arguing that the ALJ erred in relying on treatment notes written by Dr. Brar, a rheumatologist, to analyze Plaintiff's osteoarthritis. (Pl.'s Br. at 10). However, numerous treatment notes written by Dr. Brar indicate that the "[r]eason for [Plaintiff's] visit" to Dr. Brar was her "[g]eneralized osteoarthritis." (See, e.g., R. 597-99).

Furthermore, while Plaintiff argues that Dr. Brar "d[id] not specifically follow [Plaintiff's] knee concerns," Dr. Brar's physical examinations focused on Plaintiff's joints and always included specific findings regarding her knees. (See, e.g., R. 597). Therefore, it was not unreasonable for the ALJ to refer to Dr. Brar's findings when evaluating Plaintiff's osteoarthritis.

Plaintiff further challenges the ALJ's statement by arguing that "the ALJ cited Exhibit 13F" to support his assertion, although "the records that were exhibited as 13F are Parkersburg Cardiology records that do not reference [Plaintiff's] knees at all." (Pl.'s Br. at 10). In his step three reasoning, the ALJ stated that Plaintiff's right knee pain "has been identified as intermittent, at times (Exhibit 13F)." (R. 114). While the ALJ's reference to Exhibit 13F is clearly a typographical error, the error is harmless in nature. As the ALJ stated, treatment notes in the record do document Plaintiff's claims of intermittent right knee pain. (See, e.g., R. 540, 618). Furthermore, this statement was not used to support the ALJ's RFC determination. (R. 114).

Finally, Plaintiff challenges the ALJ's statement by attacking another statement that he used to support his assertion that multiple progress notes show no to minimal osteoarthritic findings. (Pl.'s Br. at 10-11). Specifically, Plaintiff argues that the ALJ erred in stating that "[a]n MRI showed osteoarthritis (Exhibit 20F)." (Id. at 10). Plaintiff contends that "the MRI that the ALJ referenced showed far more than just 'ostearthritis'" and that the "ALJ's rendering of the . . . findings is misleading and makes [Plaintiff's] knee impairment seem less severe than the objective evidence shows." (Id. at 10-11). The MRI cited by the ALJ was performed in June of 2013 and showed: (1) an undersurface tear throughout the medial meniscus, with a parameniscal cyst; (2)

moderately severe osteoarthritis; (3) a small knee joint effusion and (4) moderate tendinopathy with no associated tendon tear. (R. 580). After this MRI was performed, on June 25, 2013, O.N.P.C. Miller documented that the "MRI films of [Plaintiff's] right knee [were] reviewed" and diagnosed Plaintiff with "[r]ight [knee] [o]steoarthritis, . . . primary or secondary." (R. 539). No other findings from the MRI were discussed in the treatment notes. (R. 537-39). Therefore, the ALJ's summation of the MRI results is consistent with O.N.P.C. Miller's interpretation of the results. (Id.).

After reviewing the ALJ's reasoning and the evidence of record, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence. Plaintiff argues that the "ALJ ignored an overwhelming amount of objective medical evidence that disputed" his RFC determination, listing various MRI and X-ray results and findings from physical examinations. (Pl.'s Br. at 11-12). However, while Plaintiff's list of evidence proves that she has been diagnosed with various medical impairments, Plaintiff fails to show that she suffers from functional limitations that would prevent her from performing light work. (See id. at 8-13). Therefore, the ALJ's RFC determination appears to appropriately represent what Plaintiff can still do despite her limitations.

### ii. Whether the ALJ's Reasoning is Based on an Adequate Study of the Record

Plaintiff argues that the ALJ's RFC determination is based on an "inadequate or incomplete" study of the record. (Pl.'s Br. at 9, 11). Specifically, Plaintiff argues that "the ALJ inadequately cited medical records and ignored records from some of [Plaintiff's medical care] providers altogether—namely, [Plaintiff's] orthopedic specialist, Dr. Gary Miller." (Id. at 9). Defendant argues that the ALJ thoroughly studied the record and that Plaintiff's arguments are without merit. (Def.'s Br. at 9-11).

An ALJ's decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). However, an ALJ is "not obligated to comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Instead, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[] to 'track the ALJ's reasoning.'" McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015) (quoting Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995)). If an ALJ states that the "whole record was considered, . . . absent evidence to the contrary, we take [him] at [his] word." Reid, 769 F.3d at 865.

In the present case, the undersigned finds that the ALJ sufficiently discussed the evidence and his reasons for determining that Plaintiff retained the RFC to perform light work. When assessing Plaintiff's RFC, the ALJ discussed treatment notes written by Dr. Brar, O.N.P.C. Miller, Dr. Lin, Mountain River Physical Therapy and Johnson Chiropractic Clinic, as well as Plaintiff's testimony and her Disability Determination Explanations, both at the Initial and Reconsideration levels. (R. 115-18). While the ALJ did not comment on every piece of evidence presented, he reported that he had determined Plaintiff's RFC "[a]fter careful consideration of the entire record." (R. 115). Plaintiff points to no evidence that undermines this statement. (See Pl.'s Br. at 8-13). While Plaintiff argues that the ALJ failed to discuss treatment notes written by Dr. Miller,

the ALJ did discuss treatment notes from First Settlement Orthopaedics, where Dr. Miller is employed. (Pl.'s Br. at 11; R. 116). Furthermore, Plaintiff fails to point to any evidence that the ALJ neglected to consider. (See Pl.'s Br. at 8-13). Although he did not cite directly to Dr. Miller's treatment notes, the ALJ acknowledged that Plaintiff had "required arthroscopic surgery" in her right knee and had undergone "injection therapy" in the same knee, all of which Dr. Miller had performed. (R. 115-16). As for Plaintiff's argument that the ALJ should have more thoroughly discussed evidence that he unquestionably considered, the ALJ was not required to do so. Instead, the ALJ was required only to provide a minimal level of analysis that would allow a reviewing court to follow his reasoning, which the ALJ supplied. Consequently, the undersigned finds that Plaintiff's argument is without merit.

**b. Whether the ALJ Considered Plaintiff's Non-Severe Impairments When Determining the RFC**

Plaintiff argues that the ALJ erred by failing to consider her non-severe impairments of diabetes mellitus and asthma when determining her RFC. (Pl.'s Br. at 16). Specifically, Plaintiff challenges the ALJ's failure to "mention [her] diabetes or asthma after he found them to be non-severe at [s]tep [t]wo." (Id.). Defendant counters by arguing that, because no credible functional limitations resulted from Plaintiff's non-severe impairments, the ALJ was not required to consider the impairments in his RFC assessment. (Def.'s Br. at 15).

As discussed in Part VI.C.2, an RFC is what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 404.1545. When assessing a claimant's RFC, an ALJ must consider "all the relevant evidence" in the record, including any limitations caused by the claimant's non-severe impairments. 20 C.F.R. § 1545(a)(1); Wolfe, 2015 WL

401013, at *6. While "a non-severe impairment standing alone may not significantly limit an individual's ability to [work], it may—when considered with [the] limitations or restrictions [caused by] other impairments—be critical to the outcome of a [DIB] claim." Wolfe, 2015 WL 401013, at *6. Therefore, "in assessing a claimant's RFC, the ALJ 'must consider [the] limitations and restrictions imposed by *all* of an individual's impairments, even those that are not severe.'" Id. (quoting SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (emphasis added). Upon review of an RFC assessment, a court must read the ALJ's decision as a whole to determine whether the ALJ considered all of the claimant's complaints and limitations. See Smith v. Astrue, 457 F. App'x. 326, 328 (4th Cir. 2011) (rejecting a "per se rule that failure to provide sufficient explanation at step three requires remand and holding that [the] ALJ's finding at other steps of [the] sequential evaluation [process] may provide [a] basis for upholding [a] step three finding"); Kins v. Comm'r of Soc. Sec., No. 3:14-CV-86, 2015 WL 1246286, at *23-24 (N.D. W. Va. Mar. 17, 2015) (deeming an ALJ to have considered the plaintiff's non-severe impairments at step four when the ALJ previously discussed the impairments and their associated limitations at step two of the decision).

In the present case, the undersigned finds that a review of the ALJ's decision as a whole reveals that the ALJ considered Plaintiff's diabetes mellitus and asthma when determining the RFC. At step two of the sequential evaluation process, the ALJ noted that Plaintiff has been diagnosed with noninsulin-dependent diabetes mellitus but that the "condition [has been] relatively controlled by medications since onset." (See R. 113). Additionally, the ALJ noted that, while Plaintiff has been diagnosed with asthma, "treatment notes routinely identify [her asthma] as 'stable.'" (Id.). The ALJ, therefore,

determined that Plaintiff's diabetes mellitus and asthma are non-severe in nature because they "are not alleged or documented to cause more than a minimal [limitation]" on her ability to work. (R. 113-14). Indeed, while Plaintiff points to one instance in the record detailing a diagnosis of asthmatic bronchitis that resolved with treatment, Plaintiff fails to identify any current functional limitations caused by her diabetes mellitus or asthma. (See Pl.'s Br. at 16-17).

Because the ALJ found at step two that Plaintiff's non-severe impairments cause no more than a minimal limitation, the ALJ was not required to discuss those impairments again at step four. The ALJ, nevertheless, documented at step four that no treating physician has reported that Plaintiff suffers from any functional limitations or placed any restrictions upon her activities. (R. 113-14, 117). Consequently, Plaintiff's argument that the ALJ erred by failing to consider her non-severe impairments when determining her RFC is without merit.

## VII.  <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED,** the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be

submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 30th day of October, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE